## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MTE HOLDINGS LLC, *et al.*,<br><br>   Reorganized Debtors. | Chapter 11<br><br>Case No. 19-12269 (CTG)<br><br>(Jointly Administered) |
| RPA Asset Management Services, LLC,<br><br>   Plaintiff,<br><br>v.<br><br>Mark Siffin, MDC Acquisition LLC, Maefield Development Corporation, and MDCE Investments LLC,<br><br>   Defendants. | Adv. Proc. No. 21-51255 (CTG)<br><br>**Related <u>Docket No. 24</u>** |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

MTE Holdings and its affiliates were in the business of oil and gas exploration and development.  The debtors entered bankruptcy in late 2019 after defaulting under two loan agreements.[1]  After almost two years in bankruptcy, the debtors confirmed a plan in September 2021.  That plan established a litigation trust to pursue estate causes of action.[2]  The trustee of the litigation trust sued Mark Siffin,

---

[1] The debtors in this bankruptcy case are: MTE Holdings LLC ("MTE Holdings"); Olam Energy Resources I LLC; MTE Partners LLC; MDC Energy LLC ("MDC Energy"); Ward I, LLC; MDC Reeves Energy LLC; and MDC Texas Operator LLC.  They are referred to collectively as the "debtors."

[2] The plaintiff in this lawsuit is RPA Asset Management Services, LLC, which serves as the trustee under the trust established by the plan.  *See* D.I. 24 ¶ 6.  It is referred to as the "trustee."

the debtors' former principal owner and CEO, as well as entities that Siffin controlled.[3] The suit is fundamentally about two sets of prepetition transfers that the debtors made. *First*, in a series of transfers, debtor MDC Energy paid $8.5 million to an entity that Siffin owned and that the parties refer to as "Acquisition." The trustee asserts that this transfer is avoidable against Siffin as a constructive fraudulent conveyance under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), and recoverable against both Acquisition and Siffin (as the party for whose benefit the transfer was made) under § 550 of the Bankruptcy Code. The trustee also asserts that Siffin breached his fiduciary duties to MDC Energy by directing that this transfer be made.

*Second*, Siffin diverted to Acquisition a $9.1 million receivable that debtor MDC Energy would have otherwise been paid. Acquisition ultimately used at least some of that $9.1 million to pay valid debts owed by MDC Energy. The trustee nevertheless seeks to avoid the transfer to Acquisition under § 548(a) of the Bankruptcy Code, on the ground that the purpose of the diversion was to hinder, delay, or defraud the debtors' lenders, who could have swept the cash had it been deposited in one of the debtors' bank accounts.

The Court conducted a trial in this adversary proceeding in January 2024. The Court now issues these proposed findings of fact and conclusions of law. In short, the transfers totaling $8.5 million from MDC Energy to Acquisition constitute

---

[3] D.I. 24. The defendants are Mark Siffin, MDC Acquisition LLC (referred to as "Acquisition"), Maefield Development Corporation (referred to as "Maefield"), and MDCE Investments LLC (referred to as "MDCE Investments").

constructive fraudulent conveyances under TUFTA.  As such, the transfers can be avoided under § 550 of the Bankruptcy Code against Acquisition, as well as against Siffin.  In addition, Siffin's causing MDC Energy to transfer those funds to Acquisition for his ultimate benefit was a breach of his fiduciary duties as CEO of MDC Energy.

The Court also concludes that the $9.1 million transfer diverted from MDC Energy to Acquisition is avoidable as an intentional fraudulent conveyance under 11 U.S.C. § 548(a)(1)(A).  That transfer may be recovered against Acquisition.  While the trustee contends that Maefield and/or MDCE Investments, both of which are also affiliated companies controlled by Siffin, may also be liable as subsequent transferees, the trustee has not pointed to evidence in the existing record that would support such a conclusion.  Nor does the record contain evidence to support claims against Maefield, Acquisition, or MDCE Investments on theories of conspiracy or aiding and abetting breaches of fiduciary duty.  Finally, even if the law recognized a claim for aiding and abetting a fraudulent conveyance, no such claim has been established.[4]

### Factual and Procedural Background

### 1.    Mark Siffin and the founding of MDC Energy

Siffin was the founder and chief executive officer of MDC Energy and its subsidiaries.  While Siffin had been interested in geophysics and petrophysics since

---

[4] Because, as described further below, the claims at issue are non-core, the Court makes these proposed findings of fact and conclusions of law as provided in 28 U.S.C. § 157(c)(1) and Federal Rule of Bankruptcy Procedure 9033.

his time as a student in the 1960s, his first professional involvement in the oil and gas industry began when he visited Midland, Texas in 2012.[5]  There, he met people with deep knowledge and experience in the exploration and development of oil and gas in the Permian Basin, including John Cooper.[6]  At that time, Cooper worked for a company known as Cambrian Management, for which he was responsible for running 11 oil rigs.[7]

Siffin and Cooper would go on to form MDC Energy.  Siffin took principal responsibility for raising capital, while Cooper had the hands-on knowledge to run the day-to-day operations of the company's business – the exploration, development, and production of oil and gas.[8]  Production began with MDC Energy's first acquisition of land in the Midland Basin.[9]  The company grew over time.  At its peak, MDC Energy would produce approximately 20,000 barrels of oil day.[10]

### 2.    The debtors' corporate and capital structure

The principal operating company in the MTE corporate family was MDC Energy.[11]  The company's original operations were financed by a $70 million loan from

---

[5] Jan 17, 2024 Hr'g Tr. at 72-73.

[6] *Id.* at 72-75.

[7] *Id.* at 76.

[8] *Id.* at 74-75.

[9] *Id.* at 75-76.

[10] Jan. 17, 2024 Hr'g Tr. at 98.

[11] MDC Energy also had a number of operating subsidiaries, the most significant of which was MDC Reeves Energy. Jan. 16, 2024 Hr'g Tr. at 138-139.  For simplicity, these proposed Findings of Fact and Conclusions of Law will refer collectively to MDC Energy and its operating subsidiaries as "MDC Energy."

Fortress.[12]  Thereafter, in 2016, Apollo extended $170 million in further credit, some of which appears to have been used to take out the Fortress loan.[13]

In 2017, however, the company required access to additional capital.  The company had reached agreements to obtain new financing from two lender groups. One loan was a reserve-based loan (or "RBL") for which Natixis, New York Branch served as administrative agent.  As the name implies, this loan was secured by the company's oil reserves.  Siffin testified at trial that he believed, based on the reserves, that the loan's borrowing base was $300 million.[14]  The company was permitted, however, to draw only $60 million on this loan.[15]

The borrower on the second loan was MDC Energy's parent company, MTE Holdings.  This was in the form of a term loan, for which Riverstone Credit Management served as administrative agent.[16]  This loan provided for a total availability of $475 million, of which MTE Holdings ultimately drew $410 million.[17] Because the borrower on this loan was the parent holding company, whose principal assets were the shares of MDC Energy, this term loan was structurally subordinated to the Natixis RBL loan.

---

[12] Jan. 17, 2024 Hr'g Tr. at 76.

[13] *Id.* at 78.

[14] The MDC Credit Agreement was admitted into evidence as Pl. Ex. 1.

[15] Jan. 16, 2024 Hr'g Tr. at 93.

[16] The MTE Term Loan Credit Agreement was admitted into evidence as Pl. Ex. 2.

[17] Jan. 16, 2024 Hr'g Tr. at 92-93.

Both loans were expected to close on June 1, 2018.  Just days before the scheduled closing, however, Cooper died in a plane crash near Midland, Texas.  As a result, the two loans did not close until September 17, 2018.[18]

The loan agreements contained several requirements that are key in this dispute.  Under the terms of the Natixis loan, MDC Energy was not permitted to make "restricted payments," which included any payment of management fees, advisory fees, or the like to anyone who held equity in MDC Energy or its affiliates.[19] This provision operated to preclude the company from paying Siffin for the work he performed as CEO.[20]

The agreements also contained a series of financial covenants, requiring that the companies' "EBITDAX" – earnings before interest, depreciation, amortization and exploration costs – be at least two times their interest expense and not less than one-fourth of the companies' total indebtedness.[21]  The companies' current assets were also required to be equal to or greater than their current liabilities.[22]  The agreements granted the lenders the ability to sweep funds in the bank accounts in the event of a default, and contained cross-default provisions providing that a default under one of the loan agreements would amount to an event of default under the other.[23]

---

[18] Jan. 17, 2024 Hr'g Tr. at 80.

[19] *See* Pl. Ex. 1, § 9.04; *id.* § 1.02 (definition of "Restricted Payment").  *See also* Jan. 16, 2024 Hr'g Tr. at 96-97.

[20] *Id.* at 98.

[21] Pl. Ex. 2, §§ 1.2, 6.7.

[22] Pl. Ex. 1 at art. IX, § 9.01; Pl. Ex. 2 at § 6.7.

[23] Jan. 16, 2024 Hr'g Tr. at 116-117; Pl. Ex.  5 at art. 4.9; Pl. Ex 2 § 6.15.

### 3.      Siffin's vision to monetize saltwater disposal

The process of producing oil and gas creates, as a byproduct, a form of brine that is commonly referred to as saltwater.  For each barrel of oil produced, it is typical to generate eight to ten barrels of saltwater.  Disposing of that saltwater is one of the most significant costs associated with oil and gas exploration.[24]

Siffin testified that he believed that MDC Energy would be able to develop its own saltwater disposal capabilities that would be less expensive than it would otherwise cost to pay a third party to dispose of the saltwater.[25]  Indeed, he testified that he believed that an MDC Energy saltwater disposal system could be an affirmative source of revenue for the company as it could charge other oil exploration companies in the Permian Basin for the disposal of their saltwater.[26]  Siffin thus began work on developing such such a program in the summer of 2018.[27]  That work included obtaining the necessary land rights and lobbying the Texas Railroad Commission to obtain the required permits.

Siffin thereafter entered into negotiations with several third parties, including a company known as Waterbridge, over a potential transaction to monetize MDC Energy's saltwater disposal capabilities.   While MDC Energy and Waterbridge

---

[24] Jan. 16, 2024 Hr'g Tr. at 253-254, 260-261.

[25] *Id.* at 253-254.

[26] *Id.* at 258-259.

[27] Jan. 17, 2024 Hr'g Tr. at 109-110.

exchanged offers, the parties were never able to reach an agreement on the terms of a transaction.[28]

### 4.    MDC Energy encounters financial distress

As described above, the closing of the Natixis and Riverstone loans was delayed from June until September 17, 2018 following Cooper's death.  The loan agreements were drafted, however, so that the borrowers' compliance with the covenants was measured at the end of each quarter.  As a result of the delayed closing, MDC Energy found itself in default under the covenants at the end of September 2018, just 13 days after the loans had closed, albeit one that the lenders themselves described as a "technical" default.[29]  Even so, the borrowers were required to negotiate waivers with the lenders and were unable to draw on the loans until the waivers were finalized and executed.  Because those negotiations dragged on for months, until February 2019, the company's only source of funds to pay its vendors in the meantime were the revenues generated from oil production.[30]

In February 2019, MDC Energy and MTE Holdings obtained the requisite waivers to the loan agreements.  In connection with obtaining the waivers, the companies acknowledged existing defaults under the leverage and interest coverage ratios of the loan agreements.[31]  In April 2019, however, Riverstone refused to honor

---

[28] *Id.* at 250-251.

[29] *See* Jan. 17, 2024 Hr'g Tr. at 90-91 (Riverstone noted this was a "technical default" and Natixis acknowledged that the Riverstone default was a "nonissue.").

[30] *Id.* at 91.

[31] *Id.* at 90-91.

MTE Holdings' requests to draw funds under the loan, a decision that Siffin attributed to internal dissension within the lender group for which Riverstone served as agent.[32]   By May 2019, MDC Energy was in default as it (among other things) failed to provide its lenders with the required annual financial statements for the previous year.[33]

Throughout this time, Siffin struggled in dealing with the company's vendors, as MDC Energy fell further and further behind in paying them.  By the end of March 2019, the company's aging accounts payable report showed that $9.6 million had been outstanding for more than 90 days.[34]   Paul Cyphers, the company's chief operating officer, testified that by April 2019, MDC Energy was struggling to pay its bills as they became due, and that by then, payments to vendors were being delayed longer.[35]   Indeed, that was the month in which the company lost access to new capital.  As a result, that figure ballooned to more than $188 million by November 2019, as depicted in the following chart:

---

[32] *Id.* at 97-105.

[33] Pl. Ex. 356 (Natixis letter identifying events of default and reserving rights); Jan. 16, 2024 Hr'g Tr. at 102-104 (Siffin acknowledging that company did not provide lender with audited financials).

[34] Jan. 16, 2024 Hr'g Tr. at 97; Pl. Ex. 100.

[35] Pl. Ex. 462 at 210 (Cyphers Dep.).



Source: Pl. Exs. 100-107.

Unsurprisingly, by September 2019, vendors began halting work, and some filed suit against MDC Energy for nonpayment.[36]  In response to more aggressive efforts by Riverstone to enforce its rights under the terms of the loan agreement and exert control over the company, on October 22, 2019, MTE Holdings filed for bankruptcy protection.[37]  MDC Energy followed and filed its petition on November 8, 2019.

---

[36] Jan. 16, 2024 Hr'g Tr. at 163-165.

[37] *Id.* at 124.

5.      **The transfers in question**

While the complaint in this action originally sought to avoid and recover additional transfers totaling approximately $23.5 million, the trustee has narrowed the relief he seeks so that only four transfers are at issue.[38]  Three of the transfers were cash payments made from MDC Energy to Acquisition, with those amounts ultimately being paid to Siffin.  These transfers total $8.5 million.  The fourth transfer was a receivable for approximately $9.1 million from an MDC Energy customer, B&L Pipeco Services ("B&L"), that Siffin caused to be routed instead to Acquisition.  Acquisition used at least some these funds to pay MDC Energy's vendors on debts that MDC Energy validly owed.

With respect to the three payments that totaled $8.5 million, the record at trial showed the following.

- The first invoice, dated April 11, 2019, was for $4 million.  The invoice is from Acquisition to MDC Energy and states that it is for "services related to ETC and WaterBridge transactions Vendor and Loan management."[39]  Acquisition's bank statements similarly show $4

---

[38] D.I. 24 ¶ 34 (listing the transfers originally subject to challenge); Jan. 18, 2024 Hr'g Tr. at 17 (explaining that trustee had narrowed the transfers subject to challenge).  At trial, Siffin acknowledged the fact of these transfers, which are also reflected on the debtors' statement of financial affairs.  Jan. 16 Hr'g Tr. at 47; Pl. Exs. 458, 459.

[39] Pl. Ex. 23 at 4.  Earlier versions of the invoice listed different amounts.  *See* Pl Ex. 6 (invoice for $2.5 million); Pl. Ex. 7 (invoice for $3 million with email stating that it was "[i]ncreased per Mark").

million being deposited — $3 million on April 19, 2019 and $1 million on April 22, 2019.[40]

- The second transfer was for $3.3 million.  A June 5, 2019 invoice from Acquisition to MDC Energy stated that it is for "services related to SAF and WaterBridge transactions."[41]  Email correspondence shows that on June 5, 2019, MDC Energy initiated two wire transfers to Acquisition that totaled $3.3 million.  The first was for $1,277,499.01.[42]  The second was for $2,022,500.99.[43]  Acquisition's bank statements show receipt of these wire transfers on that date.[44]

- The third payment was for $2 million.  It was made up of two wire transfers, one on September 6, 2019 for approximately $1.67 million and one on September 9, 2019 for approximately $330,000.[45]

Acquisition is a limited liability company of which Siffin is the sole member.  As such, he acknowledged that amounts paid to Acquisition were for his benefit.  "The

---

[40] Pl Ex. 150 (April statement).  Jan. 16, 2024 Hr'g Tr. at 45 (Siffin acknowledges the $3 million payment made on April 19, 2019).

[41] Pl. Ex. 9.  The trial record indicates that SAF was a company with whom MDC Energy was in negotiations regarding a potential forward contract for the purchase of oil and gas production.  *See* Jan. 16 Hr'g Tr. at 58.

[42] Pl. Ex. 379.

[43] Pl. Ex. 382.

[44] Pl. Ex. 150 (June statement).

[45] Pl. Ex. 20.

LLC was owned by me…. The $3 million [paid by MDC Energy to Acquisition], yes, I had control of that, that was specifically paid to me."[46]

Siffin's trial testimony was clear that he determined the amount of these transfers and did so based on his own assessment of the value of the work that he performed for MDC Energy. He acknowledged that he did not negotiate with anyone over the amount he was paid. The company neither engaged an independent third-party to review the compensation nor did it conduct a market study or perform any other analysis.[47] Siffin further acknowledged that under the terms of the loan documents, he was not entitled to compensation from the company for the work entailed in serving as CEO.[48] He testified, however, that the value he added to the company through the development of the saltwater processing capability was so extraordinary that it entitled him to receipt of a commission.

In addition to the $8.5 million in cash payments that MDC Energy made to Acquisition, in October 2019 Siffin also directed one of MDC Energy's customers, B&L, to pay to Acquisition a receivable of just more than $9.1 million that was in fact due to MDC Energy.[49] Some of these funds were ultimately used to pay MDC Energy's vendors.[50]

---

[46] Jan. 16, 2024 Hr'g Tr. at 48-49.

[47] *Id.* at 60, 82-84, 246.

[48] *Id.* at 62.

[49] *Id.* at 122. *See also* Pl. Ex. 150 (Acquisition's October 2019 statement, showing receipt of wire for $9,101,439.79 on October 21, 2019).

[50] Jan. 17, 2024 Hr'g Tr. at 64.

6.      **The bankruptcy and the trustee's lawsuit**

By November 2019, MTE Holdings and its affiliates filed for bankruptcy. During the bankruptcy case, substantially all of the debtors' assets were sold under a confirmed plan of reorganization.[51]  Those assets, including the saltwater disposal system, were sold in a § 363 sale.[52]  The total purchase price was less than $100 million.[53]

The trustee filed this lawsuit in November 2021, seeking to recover $23.5 million on fraudulent conveyance and/or preferential transfer theories.[54]  As amended in February 2022, the complaint asserted eleven counts against the defendants, which included: fraudulent transfers under 11 U.S.C. § 548(a)(1)(A)-(B); preferential transfers under 11 U.S.C. § 547; fraudulent conveyances under the Texas Uniform Fraudulent Transfer Act § 24.006; recovery of the avoided transfers under § 550; alter ego and/or piercing the limited liability veil; breach of fiduciary duty; unjust enrichment; conspiracy and/or aiding and abetting fraudulent transfers and breaches of fiduciary duty; corporate waste; and disallowance of claims under § 502(d) and (j).[55]

The defendants moved to dismiss each of the counts.  The Court, in an August 2022 Memorandum Opinion, granted the motion as to one count – for alter ego and/or piercing the corporate veil – but denied the motion to dismiss the remaining counts.[56]

---

[51] *MTE Holdings LLC,* Bankr. D. Del. No. 19-12269-CTG, D.I. 2590 (Sept. 3, 2021).

[52] Jan. 17, 2024 Hr'g Tr. at 67.

[53] *Id.* at 315.

[54] D.I. 1.

[55] D.I. 24 ¶¶ 66-123.

[56] D.I. 44.

The Court then held a three-day trial in January 2024.  By the end of the trial, the trustee had narrowed its case so that the following counts remain live and are now ripe for decision:

- The trustee seeks to avoid the $8.5 million in transfers to Acquisition under TUFTA § 24.006 and § 544 of the Bankruptcy Code, and recover those transfers under § 550 of the Bankruptcy Code from Acquisition and Siffin;

- The trustee seeks to recover $8.5 million in actual damages and an unstated amount in punitive damages from Siffin on a theory of breach of fiduciary duty;

- The trustee seeks to recover an additional $9.1 million from Acquisition as an intentional fraudulent conveyance under 11 U.S.C. § 548(a)(1)(A) on the ground that the diverted payment was an intentional fraudulent conveyance; and

- The trustee seeks to recover against Maefield Development, Acquisition, and MDCE Investments on theories of conspiracy, and aiding and abetting the breach of fiduciary duty and fraudulent conveyance.

## Jurisdiction

The district court has jurisdiction over this action under 28 U.S.C. § 1334(b), as the claims asserted herein either "arise under" the Bankruptcy Code or (to the extent the claims arise under state law) are "related to" the bankruptcy case.  The proceeding has been referred to this Court under 28 U.S.C. § 157(a) and the district

15

court's standing order of reference.[57]   Defendants seek to exercise their rights to an adjudication before an Article III tribunal on those claims for which they have such a right, and thus do not consent to this Court's entry of final judgment on those claims that are non-core.[58]   The complaint acknowledges that the state law claims for breach of fiduciary duty are non-core.[59]   While the complaint asserts that the avoidance actions are core, that assertion is incorrect for the reasons this Court explained in *In re Cyber Litigation*.[60]   This Court accordingly cannot enter a final judgment in this action.   Rather, this Memorandum Opinion shall constitute the Court's proposed findings of fact and conclusions of law pursuant to Bankruptcy Rule 9033.

## Analysis

For the reasons described below, the $8.5 million transferred from MDC Energy to Acquisition is avoidable as constructive fraudulent conveyances under TUFTA and § 544 of the Bankruptcy Code.   Those amounts are recoverable under § 550  against both Acquisition as the initial transferee and against Siffin as a party for whose benefit the transfers were made.   The trustee is also entitled to recover the same $8.5 million from Siffin because his actions in transferring those funds from MDC Energy to Acquisition breached his fiduciary duties as CEO of MDC Energy.   In addition, the $9.1 million receivable diverted from MDC Energy to Acquisition is

---

[57] Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated Feb. 29, 2022.

[58] D.I. 27 at 41.

[59] D.I. 24 ¶ 12.

[60] *In re Cyber Litigation Inc.*, No. 22-50439-CTG, 2023 WL 6938144, at *4 & n.36 (Bankr. D. Del. Oct. 19, 2023).

avoidable as an intentional fraudulent conveyance under § 548(a)(1)(A). That amount is recoverable against Acquisition under § 550 as the initial transferee. Finally, the record does not contain sufficient evidence to find that Maefield or MDCE Investments were transferees of the fraudulent transfers or to find that any of the defendants had conspired or aided and abetted Siffin's breach of fiduciary duty or the fraudulent conveyances (if the law even recognized a claim for aiding and abetting a fraudulent conveyance).

I.   **The transfers totaling $8.5 million are avoidable against Siffin under § 544 and TUFTA § 24.006, and recoverable against Siffin under § 550.**

Section 544(b) of the Bankruptcy Code allows the trustee to avoid any "transfer of an interest of the debtor in property … voidable under applicable law by a creditor holding an unsecured claim."[61] Here, the trustee asserted the claim against Siffin under the Texas Uniform Fraudulent Transfer Act ("TUFTA"). Outside of bankruptcy, if an unsecured creditor of MDC Energy would have had the right to avoid the transfers in question, so too may the trustee pursue avoidance of those transfers in bankruptcy for the benefit of the estate.

TUFTA permits the avoidance of a transfer if the debtor made that transfer "without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."[62] The applicable caselaw construing Texas

---

[61] 11 U.S.C. § 544(b).

[62] Tex. Bus. & Com. Code Ann. § 24.006(a). *See also In re Essential Financial Education, Inc.,* 629 B.R. 401, 442 (Bankr. N.D. Tex. 2021).

law breaks this statutory directive into a three-prong test.  To avoid a constructive fraudulent conveyance under TUFTA, a plaintiff must establish that: (1) the debtor transferred an interest in property; (2) without receiving reasonably equivalent value in exchange for the transfer; and (3) while the debtor either was insolvent at the time of, or became insolvent as a result of, the transfer.[63]

As discussed above, the record makes clear that what was transferred was MDC Energy's property.  The $8.5 million in cash that was transferred all belonged to MDC Energy before it was transferred.  The first element is thus satisfied.  As to the second element, TUFTA defines "reasonably equivalent value" as being "within the range of values for which the transferor would have sold the assets in an arm's length transaction."[64]

The question is therefore what the debtors obtained in exchange for the $8.5 million.  The trustee argued that the debtors received nothing for that $8.5 million, since Siffin was already required to do the work associated with being CEO without receiving incremental compensation.  In response, Siffin argued that the work he performed in obtaining the saltwater disposal permits was above and beyond what would ordinarily be expected of a CEO.  As a result, he contended that the debtors

---

[63] *See id.*; Tex. Bus. & Com. Code Ann. §§ 24.005(a)(2), 24.006(a); *Askanase v. Fatjo,* 130 F.3d 657, 673 (5th Cir. 1997) (stating that § 24.006(a) "requires the claimant to prove that the transferor was (1) insolvent at the time of the transfer and (2) received less than fair value for the consideration it paid.").

[64] Tex. Bus. & Com. Code Ann.  § 24.004(d).

did obtain reasonably equivalent value for the $8.5 million "commission" that they paid him for that work.[65]

Siffin's argument is unpersuasive.  He agreed that he was not entitled to compensation for the work he did as CEO.  As described above, the debtors were expressly prohibited under the loan agreements from paying its equity holders for management services.  Even accepting Siffin's explanation that his work in developing the saltwater disposal capability generated enormous value for the company, his efforts in that regard would still fall within the parameters of what one would expect a CEO to do.  And the actual factual record in the case only makes matters worse.  All of the invoices that were generated for the work that he did described services for which he conceded he was not entitled to compensation.  And despite Siffin's own assessment that the saltwater disposal plant was worth hundreds of millions of dollars, the market said otherwise.  Siffin was unable to consummate a transaction that monetized the company's saltwater processing capability.  After an extensive marketing process (approved by this Court), the debtors' *entire* business, including the saltwater disposal permits and rights, was sold at auction for a price of less than $100 million.  Accordingly, the trustee has established that the estate did not receive reasonably equivalent value for the $8.5 million that was transferred to Acquisition.

For the final element, the plaintiff must show that the debtor was either insolvent at the time of the transfer or became insolvent as a result of the transfer.

---

[65] D.I. 93 at 4.

A claim for constructive fraudulent conveyance arising under the Bankruptcy Code would require the trustee to establish balance sheet insolvency.[66]  TUFTA, however, includes in its definition of insolvency what is sometimes called "equitable insolvency."  Specifically, under TUFTA, "[a] debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent."[67]

The trustee has established that MDC Energy was insolvent in this sense at the time of the three transfers.  The evidence (namely the payables over 90 days old) shows that by the time of the first of the challenged transfers in late April 2019, MDC Energy was unable to pay its debts as they became due.

Siffin made little effort to respond to the trustee's case on equitable insolvency, arguing only that the debtors were solvent on a balance sheet basis at the time of the transfers.  In light of the clear evidence of equitable insolvency, however, the Court need not make a specific finding about whether the debtors were insolvent on a balance sheet basis at the time of the transfers.  But the evidence before the Court suggests that the trustee would have had a strong argument for the debtors' insolvency on that basis, as well.  The company's own financials show that the debtors were solvent on a balance sheet basis at the end of March 2019 but balance sheet insolvent by the end of June 2019.[68]  (Note that the transfers at issue were made in April, June, and September of that year.)  A case could be made, however, that the

---

[66] 11 U.S.C. § 101(32)(A) (defining "insolvent" as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation").

[67] Tex. Bus. & Com. Code Ann. § 24.003(a), (b), (d), (e).

[68] Pl. Exs. 108 and 109.

price obtained through the bankruptcy sales process (even though it occurred later in time) is a more accurate reflection of the debtors' asset value than that reflected on their balance sheet. Because, however, MDC Energy's inability to pay its debts as they came due is clear for the time when each of the transfers occurred, there is no occasion to opine further on this issue.

Because the transfers may be avoided under § 544(b) of the Bankruptcy Code, the next question is recovery. To that end, § 550(a) provides that "to the extent [] a transfer is avoided under section [544(b)] of this title, the trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property."[69] As one court put it, "[o]nce a transfer is avoided, the thing avoided, or the value of that thing, can be recovered from the transferee, or from the entity for whose benefit the transfer was made."[70] There is no dispute that Siffin is the person for whose benefit the transfer was made. The record is clear that he directed the transfers be made into accounts that he controlled for the purpose of paying himself. The trustee therefore can recover the $8.5 million from Siffin.

---

[69] 11 U.S.C. § 550(a).

[70] *In re Arabella Petroleum Company, LLC*, 647 B.R. 851, 870 (Bankr. W.D. Tex. 2022) (citations omitted) (the Texas federal court stated that "interestingly, TUFTA does not appear to allow recovery from 'the entity for whose benefit the transfer was made.' However, section 550(a) comes into play once a transfer is avoided under section 544, and so the 'to or for the benefit of' language applies to transfers avoided under TUFTA as well").

## II.  Siffin breached his fiduciary duty as CEO by causing MDC Energy to transfer $8.5 million to Acquisition for his benefit.

Since MDC Energy is a Delaware entity, the internal affairs doctrine provides that Delaware law governs this breach of fiduciary duty claim.[71]  Here, under § 541 of the Bankruptcy Code, the trustee succeeds to the rights of the debtors to bring any cause of action that the debtors could have asserted before bankruptcy.

To prevail on a claim for a breach of fiduciary duty under Delaware law, the trustee must show the existence of the fiduciary duty and a breach of that duty by the fiduciary, which results in harm to the plaintiff.[72]  The standard of review that a court applies to a company's business decision depends on the circumstances.[73]  Courts typically apply the business judgment rule, which presumes that in making a business decision, the directors and officers of a corporation "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[74]  But where "corporate fiduciaries stand on both sides of a challenged transaction," then "the burden shifts to the fiduciaries to demonstrate the 'entire fairness' of the transaction."[75]

---

[71] *See In re Art Institute of Phila. LLC*, No. 20-50627-CTG, 2022 WL 18401591, at **5-6 (Bankr. D. Del. Jan. 12, 2022).

[72] *See id.* at *7.

[73] *In re Tops Holding II Corp.*, 646 B.R. 617, 698 (Bankr. S.D.N.Y. 2022).

[74] *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 33-34 (Del. Ch. 2014) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

[75] *Avande, Inc. v. Evans*, No. 2018-0203, 2019 WL 3800168, at *8 (Del. Ch. Aug. 13, 2019) (quoting *Oliver v. Boston Univ.*, No. 16570, 2006 WL 1064169, at *18 (Del. Ch. Apr. 14, 2006)).

Siffin admitted that, as the CEO of MDC Energy and its subsidiaries, he owed the fiduciary duties of care, loyalty, and good faith to the companies.[76]  Prior to the transfers in question, Siffin had never compensated himself for his services to the companies.[77]  The trustee contends that Siffin breached his duties by causing MDC Energy to "transfer funds solely for [his] own personal benefit, thereby enriching [himself], providing no benefit to MDC Energy, and damaging MDC Energy."[78]  Here, the transferred funds were the same $8.5 million that was the subject of the fraudulent conveyance claim described in Part I, above.

The duty of loyalty "requires that a corporate fiduciary act with undivided and unselfish loyalty to the corporation and that there shall be no conflict between duty and self-interest."[79]  Siffin breached his duty of loyalty by causing MDC Energy to transfer $8.5 million to Acquisition for his own personal benefit.  As the CEO, causing the company to transfer funds to an entity that he owned was a paradigmatic form of self-dealing.  Since Siffin was on both sides of the transfers, his self-dealing renders the business judgment rule inapplicable.  Instead, the burden is on Siffin to show the entire fairness of the transactions.  He is unable to do so.

Entire fairness requires the defendant to show that the "transaction was the product of both fair dealing *and* fair price."[80]  Under this onerous standard, "not even

---

[76] Jan. 16, 2024 Hr'g Tr. at 32.

[77] *Id.* at 181.

[78] D.I. 24 ¶ 105.

[79] *Oliver v. Boston Univ.*, No. 16570, 2006 WL 1064169, at *18 (Del. Ch. Apr. 14, 2006) (internal quotations omitted).

[80] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013) (no emphasis added).

an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair."[81] Here, there was no negotiation between Siffin and anyone representing MDC Energy about the money being transferred to Siffin. There was also no independent, third party to opine on whether the transferred sums were fair compensation for Siffin's services. And there was no market study conducted of compensation paid in similar circumstances to CEOs to determine the appropriate market rate for Siffin's services.[82] Accordingly, Siffin has not shown either that the price was fair or that he and the company engaged in fair dealing in connection with the challenged transfers.

The final element under a breach of fiduciary claim, harm to the plaintiff, is also satisfied. But for the breach of fiduciary duty, the $8.5 million that Siffin effectively transferred to himself would have remained in the estate and been available to the company's creditors. That is the appropriate measure of the harm.

Siffin argued at trial, for the first time, that the affirmative defense of exculpation bars the breach of fiduciary duty claim because MDC Energy's operating agreement contained an exculpation clause applicable to the officers' fiduciary duties.[83] This defense, however, was waived since the defendants did not plead it in their answer.[84]

---

[81] *Gesoff v. IIC Indus., Inc.,* 902 A.2d 1130, 1145 (Del. Ch. 2006).

[82] Jan. 16, 2024 Hr'g Tr. at 40-44, 60-61.

[83] Jan. 17, 2024 Hr'g Tr. at 94-96.

[84] *See Elliot & Frantz, Inc. v. Ingersoll-Rand Co.,* 457 F.3d 312, 321 (3d Cir. 2006) ("failure to raise an affirmative defense by responsive pleading or by appropriate motion generally results in the waiver of that defense") (internal quotation and citation omitted).

Since all of the elements of the breach of fiduciary duty claim are met, the trustee can thus recover the $8.5 million as damages. The single recovery rule, of course, means that the trustee can only recover the $8.5 million a single time. He cannot recover the same $8.5 million on both the first and second counts.[85]

The trustee also seeks punitive damages for the breach of fiduciary duty. Punitive damages, however, are not available for a breach of fiduciary duty under Delaware law.[86] The Court therefore denies the request for punitive damages.

## III.    The $8.5 million in transfers are also recoverable from Acquisition.

As discussed in Part I, the $8.5 million in transfers are properly avoidable as constructive fraudulent conveyances under TUFTA and 11 U.S.C. § 544(b). In addition to recovering those transfers from Siffin (for whose benefit the transfers were made), the trustee also (again, subject to the principle of single recovery) seeks to recover that amount from Acquisition.[87]

Under § 550(a), he is entitled to do so if Acquisition is the "initial transferee" of the transfers. Acquisition argues that because the funds were ultimately paid to Siffin, it is not a transferee at all, but rather a "mere conduit." Acquisition is unable, however, to demonstrate this.    "To be a 'mere conduit,' a defendant must establish

---

[85] *See generally Bomarko, Inc. v. Int'l Telecharge, Inc.,* 794 A.2d 1161, 1177 (Del. Ch. 1999) ("the plaintiffs are limited to, and statutorily assured of, a single recovery").

[86] *See Gesoff,* 902 A.2d at 1154; *Albert v. Alex. Brown Mgmt. Servs., Inc.,* No. 04C-05-250, 2004 WL 2050527, at *6 (Del. Super. Ct. Sept. 15, 2004); *Buchwald v. Renco Group,* 539 B.R. 31, 54 (S.D.N.Y. 2015).

[87] In the context of recovery under § 550 of the Bankruptcy Code, the principle of single recovery is codified in 11 U.S.C. § 550(d), which states that the "trustee is entitled to only a single satisfaction under subsection (a) of this section."

that it lacked dominion and control over the transfer because the payment simply passed through its hands and it had no power to redirect the funds to its own use."[88] Acquisition has not demonstrated that did not have dominion and control over the funds once they were transferred to it from MDC Energy into Acquisition's bank account.  Accordingly, the trustee is entitled to judgment against Acquisition to recover the $8.5 million in transfers.

### IV. The $9.1 million transfer to Acquisition is avoidable as an intentional fraudulent conveyance under 11 U.S.C. § 548(a)(1)(A) and recoverable under § 550.

The trustee also seeks to recover from Acquisition the $9,101,439.79 that Siffin directed MDC Energy's customer, B&L, pay to Acquisition instead of to MDC Energy. In October of 2019, MDC Energy had an account receivable from B&L.  In the ordinary course, B&L would have made that payment to MDC Energy by wiring the funds directly into MDC Energy's bank accounts.  Those MDC Energy accounts, however, were subject to a control agreement that would have permitted Natixis to sweep those funds.  On October 21, 2019, on the eve of the bankruptcy filing, Siffin directed B&L to wire the monthly payment owed to MDC Energy to Acquisition's bank account instead.[89]

Section 548(a)(1)(A) of the Bankruptcy Code empowers the trustee to avoid any transfer "of an interest of the debtor in property" if the debtor made the transfer "with actual intent to hinder, delay, or defraud" a creditor.[90]  To avoid such a transfer, the

---

[88] *In re Lenox Healthcare, Inc.*, 343 B.R. 96, 103 (Bankr. D. Del. 2006).

[89] Jan. 16, 2024 Hr'g Tr. at 121-122.

[90] 11 U.S.C. § 548(a)(1)(A).

trustee must show that (1) a transfer of an interest in property was made by the debtor, (2) within two years before the petition date, and (3) with actual intent of the transferor to hinder, delay, or defraud creditors.[91] The $9.1 million was money owed to MDC Energy for its oil, so it was the company's property. The transfer occurred the day before the debtors' filed for bankruptcy.[92]

As to the intent, the trustee must show that the debtor "had an intent to interfere with creditors' normal collection process or with other affiliated creditor rights for personal or malign ends."[93] Siffin directed B&L to wire its monthly payment owed to MDC Energy to Acquisition instead in order to prevent Natixis from sweeping those funds.[94] At that time, Siffin had never before directed any of MDC Energy's creditors to pay Acquisition instead of MDC Energy.[95]

Siffin argued he had B&L pay Acquisition so that he could use the money to pay certain MDC Energy vendors.[96] But the $9.1 million was not earmarked for any particular vendor.[97] Siffin's diverting the $9.1 million to Acquisition "[impaired] a creditor's ability to collect the debt."[98] A debtors' "intent to hinder, delay, or defraud creditors need not target any particular entity or individual as long as the intent is

---

[91] *In re Millennium Lab Holdings II, LLC*, No. 15-12284-LSS, 2019 WL 1005657, at *2 (Bankr. D. Del. Feb. 28, 2019) (citations omitted).

[92] Jan. 16, 2024 Hr'g Tr. at 125-126.

[93] 5 *Collier on Bankruptcy* ¶ 548.04 (16th ed. 2024).

[94] Jan. 17, 2024 Hr'g Tr. at 271.

[95] Jan, 16, 2024 Hr'g Tr. at 122.

[96] Jan. 17, 2024 Hr'g Tr. at 64, 197.

[97] *Id.* at 197.

[98] *Husky Int'l Elec., Inc. v. Ritz*, 578 U.S. 355, 360 (2016).

generally directed toward present or future creditors of the debtor."[99]  The $9.1 million
transfer was thus an intentional fraudulent conveyance under § 548(a)(1)(A).

As with the transfer of the $8.5 million, Acquisition was not a mere conduit.
While some (but it appears not all) of the $9.1 million went to pay MDC Energy's
valid creditors, that fact alone is insufficient to establish a mere conduit defense.
Where a transferee is "'not under any contractual or other obligation to use
[transferred funds] for the benefit of [third parties,]' but rather, may use the funds
freely, it is no a 'mere conduit.'"[100]  Acquisition had the discretion to decide what to do
with the $9.1 million.

Since the trustee demonstrated that the $9.1 million was a fraudulent
conveyance under § 548(a)(1)(A) and Acquisition's defense fails, the trustee can avoid
the transfer and recover its value under § 550(a).  Here, Acquisition is the initial
transferee of the $9.1 million since B&L wired the money directly to Acquisition.
Therefore, the trustee can recover the $9.1 million from Acquisition.

## V.    The record does not support recovery on any of the trustee's remaining claims.

The trustee did not provide sufficient evidence to demonstrate that Maefield
or MDCE Investments were transferees of the fraudulent transfers.    Unlike
Acquisition, the transfers at issue were never sent to or from Maefield or MDCE
Investments.  While Siffin did wholly own and control these entities, the trustee failed

---

[99] *In re Bayou Group, LLC,* 439 B.R. 284, 304 (S.D.N.Y. 2010) (quotations omitted).

[100] *Lenox,* 343 B.R. at 104 (citing *In re 360 Networks (USA) Inc.,* 338 B.R. 194, 202 (S.D.N.Y. 2005)).

to show any material involvement by Maefield or MDCE Investments in the fraudulent transfers.

Additionally, the trustee argued that Maefield, Acquisition, and MDCE Investments "conspired with each other and other persons to perpetrate, facilitate, and perpetuate the breaches of fiduciary duty, fraudulent transfers, and … aided and abetted the commission of all such wrongs."[101]   Under Delaware law, to establish a claim for aiding and abetting a breach of fiduciary duty the plaintiff must show "(1) the existence of a fiduciary relationship; (2) proof that the fiduciary breached its duty; (3) proof that a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) a showing that damages to the plaintiff resulted from the concerted action of the fiduciary and the nonfiduciary."[102]   Civil conspiracy, on the other hand, requires showing there is "(1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage."[103]   In this jurisdiction, case law suggests that "there is an overlap between aiding and abetting a breach of fiduciary duty and civil conspiracy to breach fiduciary duties."[104]

The amended complaint alleges that Cyphers, as COO, and Quinn, as CFO, acted as agents for Maefield and worked with Siffin to cause the fraudulent transfers in question.[105]   Cyphers and Quinn allegedly perpetrated Siffin's breach of fiduciary

---

[101] D.I. 24 ¶ 113.

[102] *In re Fedders North America, Inc.,* 405 B.R. 527, 544 (Bankr. D. Del. 2009).

[103] *In re Am. Intern. Group, Inc.,* 965 A.2d 763, 805 (Del. Ch. 2009) (quoting *Nicolet, Inc. v. Nutt,* 525 A.2d 146, 149–50 (Del. 1987)).

[104] *In re USA Detergents, Inc.,* 418 B.R. 533, 547 (Bankr. D. Del. 2009).

[105] D.I. 24 ¶ 113.

duties by creating the "sham invoices."[106]  The record, however, is best understood to suggest that Cyphers and Quinn were acting as agents of Acquisition when they created those invoices.  The trustee has not met its burden of showing, by a preponderance of the evidence, that Maefield, Acquisition, or MDCE Investments engaged in a conspiracy to perpetuate Siffin's breach of fiduciary duties or aided and abetted the commission of such breaches.  Similarly, even if the law did recognize a claim for aiding and abetting a fraudulent conveyance – and the better view is that it does not – the record would not support any such claim.[107]  The trustee is accordingly not entitled to a recovery on those theories.

## Conclusion

For the foregoing reasons, the Court recommends entry of judgment in favor of the trustee against Siffin for $8.5 million on the claims of constructive fraudulent conveyance and breach of fiduciary duty.  The Court further recommends the entry of judgment against Acquisition in the amount of $17,601,439.79 — $8.5 million on the constructive fraudulent conveyance theory and $9,101,439.79 as an actual fraudulent conveyance under § 548(a)(1)(A).

---

[106] *Id.*

[107] *See In re American Business Financial Services, Inc.,* 457 B.R. 314, 324 (Bankr. D. Del. 2011) (aiding and abetting a fraudulent transfer is not a valid claim under Delaware or federal law); *In re Green Field Energy Services, Inc.,* 594 B.R. 239, 294 (Bankr. D. Del. 2018) (there is no such thing as liability for aiding and abetting a fraudulent transfer under the Bankruptcy Code).

Finally, the Court recommends the entry of judgment in favor of defendants on all of the remaining counts.

Dated: June 14, 2024

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

# Notice Recipients

District/Off: 0311−1                     User: admin                          Date Created: 6/14/2024
Case: 21−51255−CTG                       Form ID: pdfgen                       Total: 7

**Recipients of Notice of Electronic Filing:**
aty        Jason A. Gibson          jason.gibson@cscgfm.com
aty        Marissa Miller           mmiller@glennagre.com
aty        Zhao Liu         liu@teamrosner.com

                                                                              TOTAL: 3

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**
aty        Richard Houghton         Murphy Ball Stratton LLP         3626 Wickersham Lane          Houston, TX 77027
aty        Thomas A. Zabel          Zabel Freeman          1135 Heights Blvd.          Houston, TX 77008
ust        U.S. Trustee         Office of the United States Trustee          J. Caleb Boggs Federal Building          844 King Street,
           Suite 2207          Lockbox 35          Wilmington, DE 19801
ust        U.S. Trustee         Office of United States Trustee          J. Caleb Boggs Federal Building          844 King Street, Suite
           2207          Lockbox 35          Wilmington, DE 19899−0035

                                                                              TOTAL: 4

# UNITED STATES BANKRUPTCY COURT
## District of Delaware

**In Re:**                                              Bankruptcy Case No.: 19−12269−CTG
MTE Holdings LLC
     Debtor                                     Bankruptcy Chapter:  11
_____

RPA Asset Management Services, LLC

     Plaintiff                                  Adv. Proc. No.:  21−51255−CTG

     vs.

Mark Siffin , et al.

     Defendant


### NOTICE OF PROPOSED FINDINGS AND CONCLUSIONS

Please take notice that the Honorable Craig T Goldblatt , U.S. Bankruptcy Judge, has filed the enclosed proposed findings of fact and conclusions of law in this matter.

Rule 9033(b) of the Federal Rules of Bankruptcy Procedure provides:

> Within 14 days after being served with a copy of the proposed findings of fact and conclusions of law a party may serve and file with the clerk written objections which identify the specific proposed findings or conclusions objected to and state the grounds for such objection. A party may respond to another party's objections within 14 days after being served with a copy thereof. A party objecting to the bankruptcy judge's proposed findings or conclusions shall arrange promptly for the transcription of the record, or such portions of it as all parties may agree upon or the bankruptcy judge deems sufficient, unless the district judge otherwise directs.

Following the objection period and the filing of the transcript if one is required, the clerk will transmit the proposed findings and conclusions together with any timely filed objections and transcripts to the district court.

Objections should be electronically filed using "Objection to Proposed Findings of Fact/Conclusions of Law" event in the "Other" menu option under "Adversary" or "Bankruptcy", whichever is appropriate.


                                           Una O'Boyle
                                           CLERK OF COURT

Date: 6/14/24
(VAN−488)

# Notice Recipients

District/Off: 0311−1              User: admin                    Date Created: 6/14/2024
Case: 21−51255−CTG               Form ID: van488                 Total: 9

**Recipients of Notice of Electronic Filing:**
aty      Jason A. Gibson      jason.gibson@cscgfm.com
aty      Marissa Miller       mmiller@glennagre.com
aty      Zhao Liu             liu@teamrosner.com

                                                                          TOTAL: 3

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**
md       Ron Wardell      Law Offices of Ronald Wardell, P C      5599 San Felipe      Suite 104      Houston, TX 77056
aty      Richard Houghton      Murphy Ball Stratton LLP      3626 Wickersham Lane      Houston, TX 77027
aty      Ron Wardell      Law Offices of Ronald Wardell, P C      5599 San Felipe      Suite 104      Houston, TX 77056
aty      Thomas A. Zabel      Zabel Freeman      1135 Heights Blvd.      Houston, TX 77008
ust      U.S. Trustee      Office of the United States Trustee      J. Caleb Boggs Federal Building      844 King Street, Suite 2207      Lockbox 35      Wilmington, DE 19801
ust      U.S. Trustee      Office of United States Trustee      J. Caleb Boggs Federal Building      844 King Street, Suite 2207      Lockbox 35      Wilmington, DE 19899−0035

                                                                          TOTAL: 6